LUTCHER & MOORE LUMBER CO. v.
SMITH et al. (No. 6853.) †.

(Court of Civil Appeals of Texas. Galveston.
May 4, 1915.)

MASTER AND SERVANT ☞170—FELLOW SERV-
ANTS—COMPETENCY — MASTER'S DUTY AND
LIABILITY.

Where a master's foreman or vice principal
employed as plaintiff's fellow servant a winch-
man incompetent for that position, as known
to the foreman, and plaintiff, in the course of
loading lumber on a vessel, was injured as a
result of the winchman's negligence while him-
self in the exercise of due care, the master was
liable, since a master owes to a servant the
duty of exercising ordinary care to employ rea-
sonably competent fellow servants, which duty
is nondelegable.

[Ed. Note.—For other cases, see Master and
Servant, Cent. Dig. § 336; Dec. Dig. ☞
170.]

Appeal from District Court, Orange Coun-
ty; A. E. Davis, Judge.

Action by Lee Smith and another against
the Lutcher & Moore Lumber Company.
Judgment for plaintiffs, and defendant ap-
peals. Affirmed.

Holland & Holland, of Orange, for appel-
lant. Jas. A. Harrison, of Beaumont, and
Bisland, Adams & Bruce, of Orange, for ap-
pellees.

McMEANS, J. Lee Smith, claiming to have
received personal injuries, while a minor,
through the negligence of the Lutcher &
Moore Lumber Company, a corporation, while
in the service of the corporation, brought this
suit to recover damages therefor. His fa-
ther, John F. Smith, also brought suit
against the corporation for the loss of the
services of his son during his minority, on ac-
count of said injuries. These suits were
consolidated in the court below, and on a
trial before a jury a verdict and judgment
was rendered for each of the plaintiffs, that
in favor of Lee Smith being for $5,355, and
that in favor of John F. Smith being for
$416. From this judgment the defendant
has appealed.

The Lutcher & Moore Lumber Company
was engaged in the manufacture and sale of
lumber, and had many persons in its employ-
ment. On February 22, 1910, for the purpose
of getting its lumber to market, it chartered
the steamship Nicarauga for three consecu-
tive voyages, it being understood that the
contract might be fulfilled by the substitution
of any first-class steamer in place of the
Nicarauga. It was further agreed and con-
tracted that the Lutcher & Moore Lumber
Company should have the cargo in readiness
upon the arrival in port of the steamship and
should load the same at the rate of 100,000
feet per day, or as fast as the steamer could
take the lumber at Orange (where the lumber
company's plant was located), for that por-
tion of the cargo to be loaded there, for
which the steamship would pay to the lum-

ber company, for loading, 70 cents per thou-
sand superficial feet. The lumber company
agreed to furnish a full cargo of 350,000 feet
for each trip, of which about 200,000 feet was
to be taken on at Orange, and the balance to
be barged by the lumber company to Sabine,
and there delivered alongside the vessel when
she was ready to take same on. On October
18, 1910, the steamship Nicarauga being oth-
erwise engaged, the steamship Disa was sub-
stituted for it, and was docked at Orange to
be loaded in part by the lumber company un-
der the agreement; and, there being no reg-
ular stevedore at Orange, the lumber com-
pany directed one of its employés, Joe Good-
year, who had had some experience in load-
ing ships, to take charge of the loading and
to obtain for that purpose such hands as
might be necessary, and conferred upon
him the authority to employ and discharge
such hands, to assign them their respective
duties, and direct them in the performance
thereof. Among the other hands employed
by Goodyear was the plaintiff Lee Smith,
who was then a minor, but who attained his
majority before the suit was tried. He was
employed by Goodyear without the consent of
his father, John F. Smith.

The manner of loading the steamer was
this: The lumber was run alongside the ship
on a tram or dollyway, and a chain or sling
would be placed around three or four pieces
at a time, and then hoisted by means of a
wire cable suspended from the end of the
arm of the derrick crane on the ship, and
then the crane was swung around until the
lumber came over an open hatch, and it was
then lowered into the hold, where it would
be properly placed and stacked by employés
working below. The wire cable was con-
trolled by a winch operated by steam, lo-
cated on the deck of the ship, and the winch
was tended by an employé, known as the
"winchman" who, by proper manipulation of
the machinery applied the steam and directed
the movement of the derrick or crane. The
tram or dollyway was higher than the deck
of the ship, and when the lumber was hoist-
ed by the cable, its progress toward the
hatchway was immediate and rapid. The
duty assigned to Lee Smith was placing the
chain or sling around the lumber to be
hoisted. These duties were to be performed
entirely on the shore, and at no time required
his presence on the ship. However, the lum-
ber company had placed drinking water on
the ship for all of its employés engaged in
the loading, and Lee Smith and others had
free access thereto, and would go upon the
ship for water whenever they so desired.
Sometimes in the course of loading, lumber
would be loaded through the hatchway faster
than those working in the hold could move it
out of the way and stack it, and on such
occasions further operation of the cable and
crane would be suspended until the hatchway
could be cleared. On one of these occasions

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

† Rehearing denied June 10, 1915.

Lee Smith, taking advantage of the lull, went on the ship for a drink of water, passing by the open hatch in going to where the water was kept and, after getting a drink, started to return the way he had come, and when he was near the hatchway he heard some one call out from below to know the time of day, whereupon he stepped to the side of the hatchway and informed the inquirer that it was three minutes to 12. To do this he placed himself directly in the path that the lumber would follow in passing from the tram to the hatchway. The foreman, Goodyear, was standing at the hatchway at the time Lee Smith approached it to answer the question of the man below, and Smith, as he walked up, laid his hand on Goodyear's arm, and just as he answered the inquiry the winchman, although seeing the position occupied by Smith and Goodyear, suddenly applied the steam to the winch, which immediately hoisted the sling load of lumber attached to the cable, causing it to swing with great rapidity to the hatchway, striking Smith before he could get out of its way, knocking him through the hatchway into the hold, and inflicting damages to his person to the extent and in the amount found by the verdict of the jury. Smith was not expecting the sling load to be raised at the time it was, for the reason that the hatchway was blocked with lumber already lowered through it, nor was he warned of this movement in time to remove himself to a place of safety before being struck.

The proper operation of a winch requires both skill and experience. On the morning Smith was injured Goodyear had employed one Antone Dyson to operate the winch in question. Dyson had never before operated a winch, and was unskilled and inexperienced in such work, and this was known to Goodyear at the time he employed him. Some of the employés, other than Smith, protested to Goodyear about giving Dyson this employment, telling him that Dyson was green and inexperienced and was likely to hurt somebody, notwithstanding which Goodyear continued him in the work and refused to remove him.

Among other acts of negligence alleged by plaintiff in his petition as a basis for a recovery, it is substantially charged that it was through the negligence of Dyson in operating the winch that plaintiff was injured, that Dyson was incompetent and his incompetency known to defendant, and that defendant was negligent in employing him, and that such negligence was the proximate cause of the plaintiff's injury.

The court submitted the case to the jury upon special issues, there being 34 special issues submitted, notwithstanding which we still think the judgment should be affirmed. The jury in answer to certain of these issues found, in substance, that Goodyear was the vice principal of the defendant; that he employed Dyson as a winchman; that Dyson was incompetent for that position, and that this was known to Goodyear; that plaintiff was injured as the result of Dyson's negligence; and that he himself was free from negligence contributing to his injury. All these findings were warranted by the evidence. It is too well settled to require citation of authority that the master owes to the servant the duty of exercising ordinary care to employ reasonably competent fellow servants, and that this duty is nondelegable; and that when the master fails in this duty, and as a result thereof the servant without fault on his part, is injured by the negligence of the incompetent fellow servant, the master is liable.

Appellant has presented in his brief 45 assignments of error, many of which assail the form in which the special issues were submitted by the court, and many others are based upon the refusal of the court to submit the issues in the form requested by it. Many of the objections to the charge are hypercritical, and a great many of them contain objections to the submission of issues that were wholly immaterial. We have carefully examined all of them, however, and are of the opinion that reversible error is pointed out in none of them. The case as made by the plaintiffs' pleadings referred to is supported by the material facts proved, and the verdict is not questioned as being excessive either as to the amount awarded to Lee Smith or his father.

The judgment of the court below is affirmed.

Affirmed.